E-FILED
Friday, 13 August, 2021  11:02:14 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

BETTYMARIE A. JONES,      )
                    )
       Plaintiff,      )
                    )
       v.            )     Case No. 20-cv-3053
ANDREW SAUL,        )
Commissioner of       )
Social Security,       )
                    )
       Defendant.     )

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Bettymarie A. Jones appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Jones filed a Brief in Support of Motion for Summary Judgment (d/e 18) (Jones Brief).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 22).  Jones filed a Reply Brief to Defendant's Motion for Summary Judgment (d/e 23).  The parties consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and</u>

Reference Order entered October 2, 2020 (d/e 17).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## BACKGROUND

Jones was born on June 16, 1979.  She graduated from high school and previously worked as a fast-food manager, fast-food worker, medical services housekeeper, and caregiver.  Jones alleged she became disabled on February 9, 2016 (Onset Date).  She suffered from several impairments including degenerative disc disease, hypertension, obstructive sleep apnea, depression, anxiety, post-traumatic stress disorder (PTSD), personality disorder, drug and/or alcohol abuse (cocaine), and arthritis/ligament disorder.  Certified Transcript of Proceedings before the Social Security Administration (d/e 13) (R.), at 15, 18, 28, 42, 44, 501.

## STATEMENT OF FACTS

### Evidence before the Evidentiary Hearing

On April 4, 2016, Jones saw nurse practitioner Mary Schlegl, FNP-C, with back pain and blisters.  R. 385.  Schlegl worked in the offices of Dr. Timothy Ott, D.O.  See R. 462.  On examination, Jones weighed 269 pounds, 9.6 ounces, had a body mass index (BMI) of 43.52, and was alert and in no acute distress.  She had a cluster of raised blisters on her left mid upper back.  Schlegl assessed herpes zoster (shingles) and prescribed

antiviral medication, nortriptyline to help with sleep, and Tylenol #3 with codeine for pain.  R. 385-86.

On April 15, 2016, Jones saw Schlegl for pain from her shingles rash on her left mid back.  On examination, Jones was alert and in no acute distress and her respiratory examination was normal.  Schlegl prescribed Capsaicin or hydrocortisone cream and a course of prednisone.  R. 383.

On April 26, 2016, Jones saw Schlegl for a follow up examination.  On examination, Jones was alert and in no acute distress, her neck was normal and the range of motion in her neck was within normal limits, her sensory examination was normal, her motor examination was normal, and her upper and lower extremities were normal.  Jones had soreness with paracervical palpation in the area of her back where she had the shingles rash.  R. 382.  Schlegl renewed the prescription for nortriptyline and started a prescription for naproxen.  R. 381.

On June 1, 2016, Jones saw Schlegl for back pain.  She reported the pain started when she contracted shingles.  She had some fatigue and also had mild chest tightness after walking up to 200 feet.  Jones smoked a pack of cigarettes a day.  R. 377.  On examination, she was alert and in no acute distress, her neck was normal, and her respiratory examination was

normal.  R. 378.  Schlegl ordered a chest x-ray and an echocardiogram.  R. 377.

On July 25, 2016, Jones saw Schlegl for pain in her left foot.  On examination, she was alert and in no acute distress, her respiratory examination was normal, and she had pain at left plantar fascia.  She had some tightness and discomfort with range of motion.  Jones was oriented; her insight and judgment were intact; and her moot and affect were normal.  R. 375.  An x-ray showed a small calcaneal spur on her left foot but no fracture or dislocation.  Schlegl recommended good support shoes, not going barefoot, warm moist heat, soaking in Epsom salts, and 500 mg Naprosyn (naproxen) for pain.  R. 374, 514.

On August 17, 2016, Jones completed a Function Report – Adult form.  R. 247-57.  Jones lived in house with her husband and children.  R. 247.  In the morning she got her children ready for school and drove her husband to work.  She took at least three naps during the day, and otherwise, she sat with her feet elevated.  R. 248.  She also spent a little time watching television and being online, but she did not spend much time at these activities because she got bored and she was often sleepy.  She also said she had a "lack of interest, can't concentrate for long."  She did

not engage in social activities.  R. 250.  She said that "people got on her nerves very easily," and "I don't do anything or go out."  R. 251.

Jones said that prepared all the meals depending on her pain level.  If the meal took longer to prepare, she got help and she sat and took breaks before finishing.  R. 249.  Her mother sometimes cooked for Jones' family and picked up her son after school "when I'm extremely sleep & in pain."  Jones slept "a few hours at night due to insomnia and pain."  R. 248.  She had no problems performing her personal care, but she needed reminders to take her medicine.  Jones did laundry twice a week "off and on all day."  R. 249.  Jones drove a car and went out alone.  She left the house once or twice a day and shopped twice a week, using a motorized wheelchair provided by the stores to shop.  R. 250.

Jones said that her impairments affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and get along with others.  She could walk 20 feet before she needed to rest, she could lift no more than eight pounds, and she could pay attention for three to five minutes.  She could follow written instructions, but not spoken instructions.  R. 252.  She could sit for 20 to 30 minutes at a time.  R. 257.  She got along with authority figures, but could not handle stress or changes in routine.  She had a hard time being on her feet for

more than five or ten minutes, had intense pain standing or walking for short periods, was short of breath easily, and had to move around when she was sitting.  Wearing shoes for long periods was also uncomfortable. R. 247, 253, 254.

On August 24, 2016, Jones saw Dr. Brock Swanson, M.D., for left foot pain.  She reported pain in her left foot for two years that continued to get worse.  She could only stand for "a couple minutes at a time."  R. 412. On examination, Jones was oriented and in no acute distress; she had an antalgic gait and pain on palpation of her left foot and ankle with mild generalized swelling of the left foot; she had full range of motion and normal strength in the foot; and her sensation was intact.  Dr. Swanson assessed plantar fascia syndrome, Achilles tendinitis, metatarsalgia and prescribed a walking cast.  R. 413.

On September 7, 2016, Jones saw podiatrist Dr. Duane Hanzel, M.D., for pain in her left foot.  Dr. Hanzel previously prescribed a boot for Jones' left foot, but she was not able to wear it.  R. 426.  On examination, Jones was in no acute distress, and she was oriented; her pulmonary examination was normal; she had an antalgic gait and post lateral left heel pain, full range of motion and normal strength in her left foot.  Dr. Hanzel prescribed a boot with a left heel lift.  R. 427.

On September 14, 2016, Jones saw Dr. Hanzel for foot pain.  She had been given a soft cast for her foot which she was supposed to wear for a week, but she took the cast off early because the cast caused pain. R. 422.  On examination, Jones was oriented and in no acute distress; she walked with an antalgic gait; she had lateral left heel pain, but full range of motion and normal strength; and she had normal sensation.  Dr. Hanzel diagnosed Achilles tendinitis and plantar fascia syndrome and prescribed a lace-up ankle brace and ice as needed.  R. 424

On October 5, 2016, Jones saw Dr. Hanzel for left foot pain.  She reported no improvement and was wearing a brace.  R. 449.  On examination, Jones was in no acute distress and she was oriented; her pulmonary examination was normal; she had an antalgic gait and post lateral left heel pain; she had full range of motion and normal strength.  Dr. Hanzel prescribed Diclofenac and discontinued the Naprosyn.  He told her to use the brace as needed.  R. 450.

On October 22, 2016, Jones saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  R. 438-41.  Dr. Leung had not reviewed Jones' medical records because he was sent the wrong medical records by mistake.  Jones reported sleep apnea and that her continuous positive airway pressure (CPAP) machine did not work so

she did not use it.  Jones reported that she felt tired during the day and was having herpetic neuralgia and fibromyalgia with muscle pains.  She could walk less than one-half a block and lift 5 pounds at most.  She denied illegal drug use.  R. 438.  On examination, Jones was 67 inches tall, weighed 295 pounds, and wore a left ankle brace.  Jones was in no apparent distress; her speech and hearing were within normal limits; she was alert, oriented, and cooperative; her memory was intact, and her affect was normal.  R. 439.  Her pulmonary examination was normal.  Jones walked with a moderate limp and could walk 50 feet unassisted.  She could tandem walk, but she could not hop or walk on her heels or her toes.  She could squat halfway down; she was tender diffusely; all her joints had normal range of motion; she had no muscle atrophy; she had 5/5 strength throughout her upper extremities; her sensation was normal; and her lower extremities showed no signs of edema, lesions, or varicosities.  R. 440.  Dr. Leung's impression was hypertension, sleep apnea with hypersomnia, plantar fasciitis, herpetic neuralgia and fibromyalgia with diffuse tenderness, and morbid obesity.  Dr. Leung advised Jones to seek medical attention as soon as possible for her hypertension because her blood pressure was 141/120 during the examination.  R. 441.

On October 31, 2016, state agency psychologist Dr. Linda Lanier,

Ph.D., prepared a Psychiatric Review Technique and a Mental Residual

Functional Capacity Assessment of Jones.  R. 71, 75-76.  Dr. Lanier opined

that Jones had a mental impairment of affective disorders and her mental

impairments caused mild restrictions on activities of daily living, moderate

difficulty maintaining social functioning, and mild difficulties maintaining

concentration, persistence, or pace.  R. 71.  Dr. Lanier also opined that

Jones was moderately limited in her ability to interact appropriately with the

general public.  She noted no other limitations due to Jones' mental

impairments.  R. 75.  Dr. Lanier concluded:

> [Jones] has the cognitive ability to remember general work
> procedures, and retains the capacity to understand and
> remember multi-step instructions.
> She has attention and concentration necessary to persevere at
> and complete those operations for time periods usually
> expected in the work force. She retains the capacity to maintain
> a schedule and be on time. She would need only common
> supervision. She has the pace and endurance necessary to
> fulfill a normal workday and week on a consistent basis, to
> perform at a consistent acceptable rate, and would require only
> common numbers and lengths of rest breaks. Psychologically
> based symptoms would not significantly impair her capacity to
> complete a normal work week.
> She has lowered social tolerance due to depression but can
> relate appropriately in socially undemanding settings with low
> stress demands that require only brief superficial interactions
> and with reduced interpersonal contact away from the general
> public.
> She retains the capacity to adapt to simple changes in daily
> routines, and the capacity to be aware of and self-protective of

common hazards. She retains the capacity to utilize public transportation to and from a place of work.

R. 75-76.

On November 1, 2016, Jones saw nurse practitioner Schlegl for depression and sciatica pain.  Jones said gabapentin helped with the sciatica pain and reported joint aches along her shoulders, elbows, and back.  R. 469.  On examination, she was alert and in no acute distress, oriented, her insight and judgment were intact, her mood was normal, and her affect was flat.  The examination of Jones' upper and lower extremities was normal, and her sensory examination was normal.  R. 470.  Schlegl increased the dosage in Jones' prescription for gabapentin.  R. 469.

On November 7, 2016, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment of Jones.  R. 72-74.  Dr. Smith opined that Jones could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, frequently stoop and climb ramps and stairs, occasionally kneel and crawl, and never climb ropes, ladders, or scaffolds.  R. 72-73.  Dr. Smith said that Jones should also avoid concentrated exposure to extreme cold, extreme heat, and hazards.  R. 74.

On December 13, 2016, Jones saw nurse practitioner Schlegl.  She reported left sided chest discomfort that started the prior Saturday when Jones reached over and felt something move in her chest wall.  Her chest wall was painful to touch and when taking deep breaths.  R. 463.  Jones' also completed a depression questionnaire.  Her score on the depression questionnaire had dropped since November 22, 2016.  R. 464.  On examination, Jones was 5 feet 6 inches tall, weighed 292 pounds, and had a BMI of 47.13.  She was alert, in no acute distress, and tender along the left posterior chest wall with light palpation.  Raising her left arm aggravated the pain.  Jones was oriented and her insight and judgment were intact.  Her affect was flat.  R. 465.  Schlegl assessed depression, costochondritis, and chest wall pain; prescribed a muscle relaxant cyclobenzaprine (Flexeril) and an NSAID naproxen; and ordered a chest x-ray.  Schlegl told Jones to substitute the naproxen for her prior NSAID diclofenac and to continue alternating applications of ice and heat treatments.  Schlegl also increased Jones' dosage of bupropion (Wellbutrin) and offered mental health counseling, but Jones declined.  R. 463.

On January 4, 2017, Jones saw nurse practitioner Schlegl.[1]  She reported upper chest discomfort that was aggravated with upper body movement, deep breathing, and palpation of the chest wall.  Jones also had left wrist pain, was not sleeping well at night, and took naps during the day.  R. 460.  On examination, Jones was alert and in no acute distress.  Her cardiac, pulmonary, and abdomen examinations were normal; she was oriented; her insight and judgment were intact; and her mood and affect were normal.  R. 462.  Schlegl assessed chest wall pain; costochondritis, acute; and tendonitis of the left wrist.  She prescribed a splint for Jones' left wrist and renewed Jones' prescription for gabapentin.  Schlegl noted that she previously prescribed gabapentin for back pain with sciatica and fibromyalgia.  Jones reported that, "Gabapentin helps the discomfort/fibromyalgia."  R. 460.

On January 15, 2017, Jones completed another Function Report – Adult form.  R. 275-83.  Jones lived in an apartment with her husband and two children.  She typically took her children to school and her husband to work in the mornings, then spent most of the rest of the day lying in bed.  She took two to three naps a day and watched television for about an hour

---

[1] Jones asserts that she saw Schlegl and Dr. Ott.  Jones Brief, at 9 (The uses the CM/ECF pagination because Jones did not number the pages of the Jones Brief).  Schlegl signed the treatment note as the author, and Dr. Ott signed as the supervisor.  R. 462.  The treatment note does not indicate that Dr. Ott saw Jones at this visit.

a day.  She read books, but it took her about two months to read a book and she could not concentrate long enough to sit through a movie.  She talked to a friend online a couple of times a week, and picked her children up after school and her husband after work.  She did not go anywhere else except to doctors' appointments as she did not like being around other people, especially people she did not know.  Other people got on her nerves easily and made her anxious.  R. 274-75, 278-80.

Jones made meals daily for her family which took from five minutes to several hours.  She made sandwiches, frozen dinners, and complete meals sometimes, but she rested "a lot" when she made a big meal.  She did laundry, but someone else had to carry the laundry basket for her.  R. 277.

Jones had a hard time sleeping at night due to pain and difficulty breathing.  R. 276.  She wore loose fitting clothing because she "can't stand things close to skin."  She showered only once a week and cared for her hair once a week "because it hurts & wears me out."  She had "accidents a lot" using the toilet.  R. 276.  Jones needed reminders to take showers and to take her medicine.  R. 277.  She left the house as little as possible.  She drove a car and could leave the house alone and shopped once a week for groceries and household supplies which took about an hour.  R. 278.

Jones impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, follow instructions, use her hands, and get along with others. She could lift five pounds and walk 25 feet before she had to rest one to three minutes. She could pay attention for "just a couple of mins" and became dizzy and lightheaded if she bent over or reached up too far.  She could not stand or sit for more than a few minutes at a time and did not finish what she started.  She could not follow instructions, either written or spoken and forgot things easily.  She could get along with authority figures depending on her "mood & pain level."  She could not handle stress or changes in routine and used braces and splints to walk or use her hands. R. 280-82.

On February 16, 2017, Jones saw nurse practitioner Schlegl for cold symptoms.  Schlegl said Jones had situational depression.  R. 488.  On examination, she was alert and in no acute distress.  She was oriented, her insight and judgment were intact, her recent memory was not impaired, and she had a depressed affect.  Her pulmonary exam was normal.  R. 489.

On March 1, 2017, Jones saw nurse practitioner Schlegl.  R. 608-10. Schlegl ordered oxygen for Jones because an overnight pulse oxygen report showed that Jones needed oxygen.  Schlegl ordered another sleep

study and a nasal cannula for Jones to use with her CPAP machine instead of a mask.  Jones reported that she could not tolerate the CPAP and was not using the machine.  R. 608.  She had fatigue and insomnia.  R. 609.  On examination, Jones was alert, in no acute distress, and had normal range of motion in her upper extremities.  R.  610.

On April 11, 2017, Jones saw nurse practitioner Schlegl for a follow up on fibromyalgia and depression.  Jones reported depression and insomnia; she was not exercising; she had shortness of breath with exertion; and she was smoking three fourths of a pack of cigarettes a day.  R. 602.  On examination, Jones was alert, she was oriented, her insight and judgment were intact, her mood was normal, and her recent memory was not impaired.  Her pulmonary exam was normal.  R. 604.  Schlegl encouraged Jones to exercise 30 minutes a day, five days a week, and to stop smoking.  Schlegl prescribed Tramadol for pain.  R. 602.

On April 14, 2017, Jones saw state agency psychologist Dr. Frank Froman, Ed.D., for a mental status examination.  R. 501-04.  She reported memory problems, depression, and many physical problems, but denied any history of substance abuse.  R. 501.  Jones was anxious, but her appearance with otherwise normal and she was neither suicidal nor homicidal.  Jones said that during the day she watched television, played

with her iPad, did "a little laundry," "a little cooking," and "tend[ed] to the kids."  She also said that she did minor household chores.  Dr. Froman estimated her IQ to be in the low average range; she had depression; she felt overwhelmed by her physical and psychological issues, and her husband's pressuring her to help pay the bills.  Jones avoided most relationships and went shopping late at night to avoid seeing other people.  R. 502-03.

Dr. Froman diagnosed chronic major depressive disorder, anxiety disorder, avoidant and inadequate personality traits, and low normal intellectual functioning by informal assessment.  R. 503.  Dr. Froman opined:

> **CONCLUSIONS:** Betty's rate of function now appears to be compromised to the point that she is not able to perform one and two step assemblies at or even near a competitive rate.  She does not seem able to relate comfortably to others anymore, and while she can understand oral and written instructions and manage benefits, does not appear to have the capacity to be able to withstand the stress associated with customary employment.

R. 503.

On April 17, 2017, state agency psychologist Dr. Leslie Fyans, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 99-100, 104-05.  Dr. Fyans stated that Jones suffered from depressive, bipolar, and related disorders; anxiety and

obsessive-compulsive disorders; and personality and impulse-control disorders.  Dr. Fyans opined that Jones' mental impairments caused mild limitations in her ability to understand, remember, and apply information; concentrate, persist, and maintain pace; and adapt or manage oneself. Jones' impairments caused moderate limitations in her ability to interact with others.  R. 99.  Dr. Fyans also said that Jones was moderately limited in her ability to interact with the general public.  R. 104.  Dr. Fyans reiterated Dr. Lanier's conclusion, quoted above.  R. 105.

On April 20, 2017, Jones went to the emergency room at Blessing Hospital in Quincy, Illinois complaining of a headache.  She had the headache for three days before she went to the emergency room and it was worse with movement.  She also had nausea.   R. 507.  On examination, Jones had tenderness over the paraspinal muscles of the cervical spine, no sensory or motor deficits in her extremities, no calf tenderness or swelling, and edema.  R. 507.  The emergency room physician administered an NSAID Toradol injection and discharged Jones with some Norco for the pain.  R. 508.

On April 21, 2017, Jones saw nurse practitioner Schlegl.  She complained of continuing headaches.  On examination, she was alert and in no acute distress; her neck was normal; her pulmonary examination was

normal, her sensory examination was normal and her upper and lower extremity examinations were normal; her upper extremity strength was 5/5. Jones was oriented, her insight and judgment were intact, her mood and affect were normal, and her recent and remote memory were not impaired. R. 600.  Schlegl prescribed prednisone and ordered a head CT.  R. 598.

On April 26, 2017, state agency physician Dr. Reynaldo Gotanco, M.D., prepared a Physical Residual Functional Capacity Assessment of Jones.  R. 101-04.  Dr. Gotanco opined that Jones could occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for 2 hours in and eight-hour workday; sit for six hours in an eight-hour workday; occasionally crawl, crouch, and kneel; and frequently stoop and climb ramps and stairs. R. 101-02.  Dr. Gotanco said that Jones should avoid concentrated exposure to extreme cold, extreme heat, and hazards.  R. 103.

On May 9, 2017, Jones saw Dr. Ott for medication management. Jones said her depression was stable and reported no change in her fibromyalgia.  She was compliant with her medication and denied any side effects.  She was smoking one-half to one pack of cigarettes a day and reported worsened pain, fatigue, and sleep disturbance.  Jones rated her current pain at 10/10.  R. 595.  On examination, Jones was alert, in no acute distress, and was oriented; she had a normal gait and did not need

an assistive device to ambulate; she could bear full weight on both of her lower extremities; her pulmonary exam was normal; and her upper and lower extremities exam was normal.  R. 597.

On May 16, 2017, Jones contacted the Social Security Administration representatives.  She stated that she was on oxygen up to 10 hours a day, her sleep habits were worse, she might have arthritis, and she was experiencing migraines.  The Social Security Administration representative noted the contact. R. 302.

On May 31, 2017, Jones had an x-ray of her right ankle which showed calcaneal spurring along the plantar aspect and soft tissue swelling involving the right ankle without definite evidence of acute fracture or dislocation.  R. 519.

On June 2, 2017, Jones saw nurse practitioner Schlegl for a recheck after her visit with Dr. Ott.  R. 590.  On examination, Jones was alert and in no acute distress;  her pulmonary exam was normal; she was able to bear full weight on both her left and right lower extremities; she was oriented; her judgment and insight were intact; and her mood and affect were normal.  R. 592-93.

On July 13, 2017, Jones saw Dr. Ott for depression and hypertension.  R. 583-86.  Her depression had worsened since her last

visit.  She was compliant with her medications and denied any side effects

from the medications.  She was doing well with her blood pressure goals.

R. 583.  On examination, Jones was in no acute distress; her neck was

normal; she was oriented; and her affect and mood were normal.  R. 585.

Dr. Ott renewed Jones' medication, told her to practice good sleep hygiene,

stop smoking, and work on exercise.  Dr. Ott recommended at least 30

minutes of exercise five or more days per week to all his patients.  R. 583.

On July 24, 2017, x-rays of Jones' thoracic and lumbar spine showed

mild scoliotic curvature of the thoracic spine with multilevel degenerative

changes, mild multilevel lumbar spondylosis, and no definite evidence of an

acute fracture or subluxation of either the thoracic or lumbar spine.  R. 523-

24.

On August 2, 2017, x-rays of Jones' cervical spine showed no acute

or abnormal findings, straightening of the normal cervical lordosis due to

patient positioning or muscle spasm, and normal prevertebral soft tissue.

R. 525.

On August 4, 2017, Jones saw licensed clinical professional

counselor JoAnn O'Rourke, L.C.P.C., for depression.  R. 673-74.  She

reported depression for the past year and wanted to talk to someone.

Jones lived with her husband and two children, a daughter age 14, and a

son age 8, and was not working.  She previously worked at Blessing Hospital in housekeeping, but was fired "because she was calling in sick too often."  R. 673.  Jones said she hated people and shopped for groceries when few people were in the store.  She had insomnia and gained 60 pounds in the last year.  She said her memory was not very good and she felt like she was in a "fibro fog" much of the time. Jones reported that she "loses" her words more frequently as the day progresses. She kept a list of appointments so she would not forget them and rated herself at 3 on a scale of overall functioning from 1 (negative functioning) to 10 (positive functioning).  R. 673.  Jones appeared somewhat anxious and depressed; she was oriented and denied any suicidal or homicidal ideations.  Counselor O'Rourke diagnosed Jones with major depressive disorder, moderate, and recommended psychotherapy.  R. 674.

On August 12, 2017, an x-ray of Jones' right ankle showed no acute abnormality.  R. 526.  On August 30, 2017, an MRI of Jones' right ankle showed tenosynovitis of the tibialis and flexor digitorum longus with edema and inflammatory change in the soft tissue of the ankle, sprain or partial tear of the deltoid ligament complex, and hallux valgus and degenerative changes in the first metatarsophalangeal joint.  R. 527.

On August 27, 2017, Jones saw Dr. Hanzel.  On examination, Jones had left heel pain, but full range of motion, normal strength, normal gait and station, and intact sensation.  Dr. Hanzel assessed a tear in the deltoid ligament of the right ankle, and hyperkeratosis and porokeratosis of the left foot.  Dr. Hanzel sharply reduced the hyperkeratosis and porokeratosis with a scalpel, removed the core of the porokeratosis, and told Jones to continue using NSAIDs for pain.  R. 692.

On October 31, 2017, MRIs of Jones' thoracic and lumbar spine showed minimal spondylosis of the thoracic and lumbar spine without significant central canal stenosis and no significant neural foramina narrowing.  R. 530-31.

On November 15, 2017, Jones saw Dr. Hanzel for a follow up for her deltoid ligament tear.  She was wearing the speed brace and was not having as much pain.  R. 740.  On examination, Jones was oriented and in no acute distress; she had an antalgic gait and left heel pain but full range of motion and normal strength.  Dr. Hanzel told Jones to continue wearing the lace up speed brace.  R. 742.

On December 7, 2017, Jones participated in a sleep study read by Dr. Nanjappa Somanna, M.D. who determined that the study showed that Jones had severe obstructive sleep apnea with hypoxia.  Dr. Somanna

recommended a bilevel with BiFlex machine with heat and humidity and an appropriately fitted mask and weight loss.  Dr. Somanna also recommended a download of data from the BiFlex machine to confirm the resolution of apneas and hypopneas.  R. 592-93.

On December 13, 2017, Jones saw Dr. Hanzel for a follow up.  She was wearing the lace up brace and reported a 50 percent improvement. She reported a pins and needles feeling in both feet.  R. 730.  On examination, Jones was oriented and in no acute distress; she had abnormal range of motion in her midtarsal joint and subtalar joint; and she had an antalgic gait with left heel pain but normal strength.  Her sensation was intact.  Dr. Hanzel said to keep wearing the brace.  R. 732.

On December 14, 2017, Jones saw counselor O'Rourke.  She reported that she stopped coming to therapy because she started to use crack cocaine again.  She had not used crack cocaine for several months prior to the relapse in August 2017.  She used crack cocaine "when she has the money, and usually it is because he 'pisses me off."  Her husband … spends a good deal of money on alcohol, so she thinks 'he can spend money, why can't I?'"  Jones also used crack cocaine "to stay awake and to be free of pain."  R. 668.  Jones authorized O'Rourke to tell Schlegl about

her drug use.  Jones agreed to resume regular sessions with O'Rourke.  R. 668.

On December 18, 2017, Jones saw nurse practitioner Mandy Brummell, FNP-C, for a follow up on acid reflux.  On examination, Jones was alert and in no acute distress; she was oriented and her affect was normal; her pulmonary exam was normal.  R. 727-28.

On January 11, 2018, Jones saw counselor O'Rourke.  Jones was exhausted at the session because she took care of her family members who were all sick over the holidays.  She reported that she was diagnosed with sleep apnea, and her doctor told her she could very well die if she did not use her CPAP machine.  Jones said she received her new CPAP machine two weeks earlier but had not started using it.  She said, "If I die, I die."  O'Rourke stated that Jones was not actively suicidal but was exhausted and frustrated with her life.  Jones completed her therapy session with O'Rourke and was in a brighter mood when she left the session.  R. 667.

On January 30, 2018, Jones saw advanced practice nurse Schlegl.[2] R. 556-58.  Jones had not used her CPAP machine after the December

---

[2] At some point in time, Schlegl's credentials changed from nurse practitioner (FNP-C) to advance practice nurse (APRN, CNP).  R. 806.

2017 sleep study.  She had not used her CPAP machine for five years and said that she could not wear the mask that she received previously.  On examination, Jones was in no acute distress; she was oriented; her insight and judgment were intact; and her mood and affect were normal.  R. 558. Schlegl ordered a restart of Jones' CPAP.  R. 556.

On May 25, 2018, Jones saw psychiatrist Dr. John Bejoy, M.D., for an initial psychiatric evaluation.  R. 676-79.  Jones reported that she felt depressed, fatigued, sad, and did not want to do anything.  She was prescribed Wellbutrin but was not compliant and had some sleep disturbance.  She was not compliant with using her CPAP machine.  Jones denied any homicidal or suicidal ideations and she had no psychotic, manic, or hypomanic symptoms.  R. 676.  Jones had not had any inpatient psychiatric hospitalizations, but had also been prescribed "Zoloft, trazadone, and olanzapine for mood and sleep but did not like it and has not been taking it."  R. 677.  She reported using crack cocaine for the last three to four years a couple of times a week, but had not used crack cocaine for the prior three and one-half weeks.  She was married with a 15-year old daughter and another 9-year old child.  On examination, Jones was alert, and oriented; her mood was "blah," and her affect was reactive; her speech was normal; her thought process was linear; and her judgment

and insight were poor to fair.  Dr. Bejoy assessed anxiety, depression, and stimulant use disorder cocaine.  R. 678.  Dr. Bejoy encouraged Jones to be compliant with the Wellbutrin prescription and to continue to see her therapist.  R. 679.

On May 30, 2018, Jones saw Dr. Hanzel for right post tibial tendonitis.  She reported right ankle pain but no foot pain.  R. 703.  On examination, Jones was in no acute distress, and she was oriented; her pulmonary exam was normal; she walked with an antalgic gait and post lateral left heel pian; and she had full range of motion and normal strength. Dr. Hanzel prescribed a right heel pad to take pressure off the Achilles tendon.  R. 705.

On June 25, 2018, Jones saw advanced practice nurse Brummell, APRN, CNP, for a follow up after an upper endoscopy due to chronic acid reflux.  R. 698-701.[3]  Jones said she had "good days and bad days, but she was feeling better overall."   In a review of her symptoms, Jones reported depression, anxiety, and panic attacks.  R. 698.  On examination, she was alert and in no acute distress; her neck was supple; she was oriented and her affect was normal.  R. 701.

---

[3] Brummell changed her credentials from nurse practitioner FNP-C to advanced practice nurse, APRN, CNP.

On July 30, 2018, Jones saw Dr. Hanzel for a follow up on her
"posterior tibial tendonitis of her R foot/tear of deltoid ligament R ankle."
Jones reported that the pain was worse when waking up and otherwise
unchanged and rated her right ankle pain at 8/10.  She was not wearing her
brace at the office visit.  R. 694.  On examination, Jones was in no acute
distress and was oriented; her pulmonary exam was normal; she walked
with an antalgic gait with pain in the right medial ankle and foot with deltoid
ligament tear, but she had full range of motion and normal strength; her
sensation was intact.  Dr. Hanzel renewed her prescription for Diclofenac.
R. 696.

On August 28, 2018, Jones saw advanced practice nurse Schlegl for
a blood pressure check.  Jones also reported left wrist carpal tunnel
syndrome symptoms.  Schlegl indicated Jones was awaiting insurance
approval for an EMG/nerve conduction study.  R. 540.  On examination,
Jones was alert and in no acute distress.  She was oriented, her insight
and judgment were intact, and her mood and affect were normal.  Jones'
pulmonary exam was normal and she had positive Phalen's and Tinel's
signs in both wrists with left greater than right.  R. 541-42.

On September 11, 2018, Jones saw advanced practice nurse Schlegl
with paperwork for her disability claim.  On examination, Jones weighed

291 pounds 6 ounces, and had a BMI of 47.03; she was alert and in no acute distress; her pulmonary exam was normal.  Schlegl assessed BMI between 45 and 49.9, fibromyalgia, chronic back pain, neuralgia of the left foot, bilateral carpal tunnel syndrome, nicotine dependence, and obstructive sleep apnea.  Schlegl noted that Jones did not tolerate her CPAP and did not wear it.  She also noted that the carpal tunnel syndrome diagnosis was based on symptoms and Jones was awaiting an EMG/nerve conduction study.  R. 804.

On September 11, 2018, Schlegl completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form (Medical Source Statement).  R.682-84.  Schlegl opined that Jones could lift less than 10 pounds, both occasionally and frequently; stand and walk for less than a total of two hours in an eight-hour workday; sit for less than a total of two hours in an eight-hour workday; sit for 20 minutes before needing to change position; and stand 15 minutes before needing to change positions. Schlegl stated that during an eight-hour workday, Jones would need to walk around seven or eight times, each time for five minutes; shift positions at will; and lie down four or five times.  Schlegl opined that Jones could occasionally twist, stoop (bend), climb stairs, reach, handle, finger, and feel; and never crouch, climb ladders, or push or pull with either her upper

or lower extremities.   Schlegl said that the opinions were supported by medical findings of fibromyalgia, chronic back pain, lumbar spondylosis, bilateral carpal tunnel syndrome symptoms, and left foot neuralgia.  R. 682-83.  She opined that due to Jones' impairments Jones would be off task at work 25 percent and would need to take seven to eight unscheduled breaks, each lasting 30 minutes.  Schlegl agreed with Jones' claim that her disability began on the Onset Date.  R. 684.

On September 17, 2018, Jones saw Dr. Hanzel.  She reported left foot pain severe enough to cause trouble bending her toes.  R. 686.  On examination, Jones was oriented and in no acute distress; she walked with an antalgic gait and had left heel pain, but full range of motion and normal strength in her foot and ankle; she had porokeratosis left foot plantar lateral with no infection; and her sensation was intact.  Dr. Hanzel assessed porokeratosis and left foot pain, debrided the porokeratosis, and resected a keratotic plug.  R. 687.

On October 3, 2018, Jones saw Dr. Walid Hafez, M.D., for an EMG/nerve conduction study.  Dr. Hafez found that the study was "essentially electrophysiologically benign."  Dr. Hafez stated, "The patient may have possibly early carpal tunnel not yet showing slowing of

conduction. Further assessment of the patient's pain and sensory complaints, is appropriate."  R. 865.

<u>The Evidentiary Hearing</u>

On October 2, 2018, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 36-66.  Jones appeared in person and with her attorney.  Vocational expert Nicole King appeared by telephone.  R. 38, 40-41.

Jones testified first. She stated that her back pain and fibromyalgia caused her the most problems.  She had constant pain in her mid to lower back that traveled into her hips and legs down to her knees.  Any activity worsened her back pain and lying down and applying heat lessened the pain.  Using a TENS unit also lessened the pain and she used a TENS unit three times a day, two to four days a week.  R. 57.  She took meloxicam and cyclobenzaprine for the pain.  R. 45-47.  These medications reduced her pain, "Very little."  The cyclobenzaprine made her feel "loopy" and "sleepy."  R. 47.

Jones stated that she experienced fibromyalgia flares three to four times a week and the flares typically lasted all day.  During these flares, Jones experienced pain in her back, neck, and head and she could not do anything on days that she experienced fibromyalgia flares.  R. 48.  She

also experienced "brain fog" from fibromyalgia three to five times a week. R. 55-56.  During a brain fog, everything was "real hazy" and "a big blur." Jones couldn't concentrate, remember, or focus on anything.  R. 56.

Jones said she could not carry a half a gallon of milk from her kitchen to her dining area.  She could stand for two to three minutes before she became dizzy and her legs became weak.  She could walk for two minutes before she again became dizzy, her legs became weak, and she became short of breath.  She could sit for 15 to 20 minutes and then she would need to get up and move around.  In a typical day, Jones lay down for at least six hours out of the eight hours from 8:00 a.m. to 4:00 p.m., she could not bend, squat, or kneel, and said she had difficulty walking up and down stairs.  R. 48-51.  Jones carried a pillow with her to sit on when she was away from home.  R. 57.

Jones rated her memory as "somewhere in the middle" between good and bad.  On a good day, if someone orally gave Jones a list of five items to buy at a store, she could remember two out of five items.  When Jones was working, she would have remembered three or four of the items on such a list.  She could pay attention for only a few minutes to a television show or read a book.  R. 51-52.  She had to be reminded to shower.  R. 57.

Jones took care of her personal hygiene and personal care.  She rarely cooked and she did little or no housework and no yardwork at all.  R. 53-54.

Jones did not like being in crowds.  She went shopping late at night to avoid being around other people and she did not attend social functions with her family.  She lived with her husband, her two children ages 16 and 9 years, and her mother.  R. 52-53.

The ALJ asked Jones about her mental health counseling and her cocaine use:

Q You've been in counseling for quite a while, right?

A Yes.

Q Okay. Are you finding it helpful?

A Yes.

Q Okay. There's some references in the counseling about using crack cocaine. Do you still use?

A I'm trying not to.

Q Okay. What's a normal amount for you because I don't, it doesn't really specify in there? Or how many times a week?

A It's be like one time a week, maybe twice a month.

Q Okay. Is this a lot less than you used to do?

A Yeah.

R. 54.

Jones had a breathing machine to help her breath at night, but she did not use it.  R. 54.  She still had problems with her feet.  She had plantar fasciitis in the left foot and a torn ligament in her right foot and she wore a brace on her right foot.  R. 54-55.

Vocational expert King then testified.  Jones stipulated to King's qualifications to testify as an expert.  R. 60.  The ALJ asked King the following hypothetical question:

> All right, for hypothetical one, assume please a hypothetical person as of the same age, education, language, and work background as the claimant.  Further assume if there is work the hypothetical person could do, it would be subject to the following conditions and limitations.  This first set of limitations is based on the state agency assessments in the record.  This hypothetical person could lift, carry, push, pull up to 20 -- two, zero -- pounds occasionally, 10 pounds frequently.  The hypothetical person though can stand and/or walk two hours total, two hours total in the eight-hour workday.  And could sit for up to six hours total in the eight-hour workday.  This hypothetical person can frequently climb ramps and stairs but can only occasionally climb ladders, ropes, and scaffolds.  The hypothetical person could frequently stoop, can only occasionally kneel, crouch and crawl.  The hypothetical person should have no more than occasional exposure to the following environmental limitations, extreme cold, extreme heat, unprotected heights, and dangerous machinery.  Mental limitations are as follows, the hypothetical person could understand, remember, and carryout, I'm going to reduce that to simple tasks and instructions.  The hypothetical person could sustain concentration, attention, and persistence on those simple tasks. This hypothetical person could interact adequately with supervisors and coworkers but only rarely, which I will define as 15 -- one, five -- percent of the workday with the general public.  And the hypothetical person could

respond appropriately to routine workplace changes.  Ms. King, given all of these restrictions would the hypothetical person be capable of performing any of the claimant's past work?

R. 61-62.  King said that the person could not perform Jones' prior relevant work.  R. 62.  King said such a person could perform other jobs in the national economy, including the examples of final assembler with more than 100,000 such jobs in existence nationally; envelope stuffer, with more than 10,000 such jobs in existence nationally; and table worker, with more than 150,000 such jobs in existence nationally.  R. 62.  The hypothetical person could perform the same jobs even if she was limited to occasional interactions with supervisors and co-workers.  R. 63.

King said the hypothetical person could not work if she was additionally limited to standing or walking for two hours a day and sitting for two hours a day.  R. 64.  A person also could not work if she needed excessive bathroom breaks or she needed to lie down during the workday. R. 64-65.

## THE DECISION OF THE ALJ

On December 21, 2018, the ALJ issued his decision.  R. 15-30.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education, and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden at Step 5 to present evidence that,

considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Jones met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since the Onset Date, February 9, 2016, and she suffered from the severe impairments of degenerative disc disease, obesity, hypertension, obstructive sleep apnea, depression, anxiety, PTSD, personality disorder, drug and/or alcohol abuse (cocaine), and arthritis/ ligament disorder of the foot and ankle.  R. 18.  The ALJ found that Jones' impairments of chronic obstructive pulmonary disease (COPD) and/or asthma, and carpal tunnel syndrome were non-severe.  The ALJ found that Jones failed to present medical evidence to establish that she had a medically determinable impairment of fibromyalgia. R. 18-19.[4]

The ALJ found at Step 3 that Jones' impairments or combination of impairments did not meet or medically equal a Listing.  In evaluating Jones' mental impairments, the ALJ found that Jones was moderately limited in understanding, remembering, or applying information; moderately limited in

---

[4] Jones did not challenge the ALJ's finding that she did not have medical evidence to establish that she had a medically determinable impairment of fibromyalgia.

interacting with others; moderately limited in concentrating, persisting, or maintaining pace; and moderately limited in adapting or managing oneself. The ALJ relied on the numerous medical reports that noted normal mood, affect, insight, and judgment, and intact memory.  The ALJ also relied on Jones' Function Report to find that she could engage in activities such as household chores and driving.  The ALJ acknowledged some parts of the record showed greater limitations.  Overall, the ALJ determined that a finding of moderate limitations was appropriate.  R. 20-22.

Before reaching Step 4, the ALJ found that Jones had the following RFC:

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: Lift, carry, push and pull no more than 20 pounds occasionally and 10 pounds frequently. No more than frequent climbing of ramps and stairs. No more than occasional climbing of ladders, ropes, and scaffolds. No more than frequent stooping. No more than occasional kneeling, crouching, and crawling. No more than occasional exposure to extreme cold, extreme heat, unprotected heights, and dangerous machinery. Understand, remember, and carry out no more than simple instructions. Concentrate, attend, and persist on simple tasks and instructions. No more than occasional interaction with supervisors and coworkers, but no more than rare (i.e. 15% of the workday) interact with the general public. Able to respond appropriately to routine workplace changes. In formulating this conclusion, the undersigned reduced the state agency assessments slightly at 1A, 2I, 6A, and 7A [RFC assessments of Dr. Smith and Gotanco] based on the totality of the record.

R. 22-23.  The ALJ relied on medical records that showed normal strength, sensation, tone, and reflexes and cited records that indicated Jones' gait and range of motion were not as severely limited as claimed by Jones.  The ALJ also noted that Jones received conservative treatment.  R. 25.  The ALJ noted that Jones was not compliant with her CPAP/BiFlex therapy for her sleep apnea.  The ALJ again noted on the numerous findings that Jones had normal mood, affect, insight, judgment, and an intact memory and noted the conservative treatment for her mental impairments.  R. 25-26.

The ALJ gave great weight to the opinions of Drs. Smith and Gotanco.  The ALJ found their opinions consistent with the evidence in the medical records regarding Jones' physical functional limitations due to her impairments.  R. R. 26.  The ALJ gave limited weight to the opinions of psychologists Drs. Fyans and Lanier.  The ALJ noted that Drs. Fyans and Lanier found that Jones only had functional limitations in social relationships.  The ALJ found that the non-exertional limitations in the RFC more accurately accommodated Jones' fatigue related to the sleep apnea and the evidence of pain than those found by Drs. Fyans and Lanier.  R. 26.

The ALJ gave little weight to Dr. Froman's opinions, finding that Dr. Froman's opinions were not consistent with the clinical findings in many medical records of normal alertness, mood, behavior, memory, and judgment.  The ALJ also found that Dr. Froman did not know Jones was using crack cocaine and her condition improved with treatment and sobriety.  R. 27.

The ALJ also gave little weight to the opinions of advance practice nurse Schlegl.  The ALJ noted that Schlegl was not an acceptable medical source under the regulations and Schlegl did not cite to the record to support her opinions.   The ALJ also found that Schlegl's opinions were inconsistent with other evidence in the record.  The ALJ cited the EMG/nerve conduction study that was essentially benign; the conservative treatment of Jones' physical impairments, and the findings in the medical records regarding Jones' "upper-extremity-related strength, sensation, reflex, tone, join, and range of motion;" and clinical findings related to alertness, and Jones' continued smoking and her non-compliance with the use of her CPAP.  R. 27.

Upon determining Jones' RFC, the ALJ found at Step 4 that Jones could not perform her past relevant work.  At Step 5, the ALJ found that Jones could perform a significant number of jobs in the national economy.

The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. part 404, Subpart P, Appendix 2, and the opinions of vocational expert King that a person with Jones' age, education, work experience, and RFC could perform representative jobs of final assembler, envelope stuffer, and table worker.  R. 28-29.  The ALJ found that Jones was not disabled.  R. 29-30.

Jones appealed.  On December 23, 2019, the Appeals Council denied Jones' request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  Jones filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The RFC determination that Jones could perform a limited range of sedentary work was supported by: (1) medical records that consistently find normal mood, affect, judgment, insight, and an intact memory; (2) medical records, including Dr. Leung's examination, that found normal strength and range of motion in Jones' upper extremities; and (3) by the opinions of Drs. Smith and Gotanco and psychologists Drs. Lanier and Fyans.

Jones argues that the ALJ erred in giving little weight to the opinions of advanced practice nurse Schlegl.  The Court disagrees.  The ALJ expressly considered the fact that Schlegl had treated Jones.  The ALJ also correctly noted that Schlegl was not an acceptable medical source under

the regulations governing this case.[5]  As such, the ALJ was required only to explain the weight given to the Schlegl's opinions.  20 C.F.R. 404.1527(f)(2).  The ALJ explained that there were "multiple inconsistencies between her opinions and the broader record."  R. 27.  The ALJ gave several examples of these inconsistencies:

> For example, the suggested manipulative limitations are grossly inconsistent with factors like the benign EMG/NCS results and the nature and frequency of the conservative upper-extremity-related strength, sensation, reflex, tone, joint, and range of motion clinical signs. Likewise, the suggested off-task and sitting-related limitations are not consistent with the nature and frequency of the conservative clinical alertness sign or the conservative spine-related imaging study results. The multiple catastrophic limitations in this opinion are also not consistent with the nature, frequency, and efficacy of the claimant's conservative long-term musculoskeletal treatment modalities, or with the prevalence of conservative respiration-related clinical findings even despite the smoking and the CPAP noncompliance, as discussed.

R. 27 (internal citations to the record omitted).  The ALJ minimally explained his analysis of Schlegl's opinions and that analysis was supported by substantial evidence. Herron, 19 F.3d at 333.  There was no error.

---

[5] The Commission amended its regulations for all cases filed on or after March 27, 2017.  The amended regulations provide that advanced practice nurses working in their licensed scope of practice are acceptable medical sources.  See 20 C.F.R. 404.1502(a)(7).  Jones filed her claims on August 1, 2016, so the amended rules do not apply.

Jones argues that the ALJ erred in giving little weight to the opinions of the state agency examining psychologist Dr. Froman.  The Court again disagrees.  The ALJ found that Dr. Froman's opinions were not consistent with the medical records that showed normal mood, affect, insight, judgment, and an intact memory.  The ALJ also noted that Dr. Froman did not know that Jones was using crack cocaine, and so, did not include the effects of cocaine in his evaluation of Jones.  The ALJ noted that Jones improved "with treatment/sobriety."  R. 27.  Jones argues that she was not using cocaine when she saw Dr. Froman in April 2017.  Jones, however, told Dr. Bejoy on May 25, 2018, that she had been using cocaine for the prior three to four years.  R. 678.  That statement supports the ALJ's finding that Jones was using when she saw Dr. Froman.

Jones also disputes the ALJ's finding that Jones had improved with treatment/sobriety.  The ALJ relied, in part, on Jones' testimony to support her finding that Jones' mental impairments had improved with treatment/sobriety.  R. 27.  As quoted above, Jones testified that her regular mental health counseling sessions were helping her, and she was reducing her use of crack cocaine.  R. 54.  In light of that testimony, the Court finds that substantial evidence supported this finding by the ALJ. The ALJ, therefore, minimally explained the basis for the weight given to

Dr. Froman's opinions and that determination was supported by substantial evidence.

Jones argues that the ALJ failed to state the weight given to Dr. Leung's opinions.  Dr. Leung only performed a consultative examination.  The ALJ considered and repeatedly relied on Dr. Leung's findings in his examination.  See R. 18-28 passim (referred to by record exhibit number 5F).  The Court sees no error in the ALJ's consideration of Dr. Leung's examination.  Dr. Leung did not offer any medical opinions on Jones' functional limitations, so the ALJ did not need to assign any weight.  There was no error.

Jones argues that the ALJ failed to account for her fatigue and pain in formulating the RFC.  The Court disagrees.  The ALJ limited Jones to a limited range of sedentary work due to the severity of her impairments, including her pain.  The ALJ also reduced the RFC to following simple instructions and performing simple tasks to account for her fatigue and pain.  Drs. Fyans and Lanier opined that Jones could remember and understand multi-step instructions.  R. 75-76, 104-05.  The ALJ rejected these opinions and limited Jones to simple tasks due to her fatigue and pain.  See R. 26 ("[T]he above RFC finding better accounts for the updated record, with particular emphasis on the mental/fatigue-related aspects of

the apnea and pain-related evidence outlined earlier."); <u>see</u> <u>also</u> R. 61-62.

The ALJ considered Jones' fatigue and pain symptoms in his formulation of

the RFC.  There was no error.

Finally, Jones urges the Court to formulate a new RFC:

> <u>Plaintiff is asking this court do what the ALJ should have done;</u>
> <u>form a residual functional capacity on the entirety of the</u>
> <u>substantial evidence</u>. Plaintiff is not asking this court to reweigh
> the evidence.  Plaintiff is asking this court to look at the record
> as a whole to see substantial evidence does not support the
> ALJ's finding.

<u>Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e</u>

<u>23)</u>, at 4 of 5 (emphasis added).  Asking the Court to formulate a new RFC

is, in fact, asking the Court to reweigh the evidence.  Formulating an RFC

would necessarily require the Court to evaluate the conflicting evidence,

such as the opinions of Drs. Smith and Gotanco verses the opinion of

advanced practice nurse Schlegl, and assign a weight to the evidence.

The Court may not reweigh the evidence.  <u>Jens</u>, 347 F.3d at 212 (7th Cir.

2003); <u>Delgado</u>, 782 F.2d at 82.  As explained above, the ALJ's

determination of the RFC was supported by substantial evidence.

The ALJ's decision at Step 5 was supported by the RFC finding and

the opinions of vocational expert King.  The decision that Jones was not

disabled was supported by substantial evidence.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 22) is ALLOWED, Plaintiff Bettymarie A. Jones' Brief in Support of Motion for Summary Judgment (d/e 18) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   August 12, 2021

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE